| | | |
|---|---|---|
| SEOUL BROADCASTING SYSTEM INTERNATIONAL, INC., | : <br> : <br> : | UNITED STATES DISTRICT COURT <br> MIDDLE DISTRICT OF FLORIDA <br> CASE NO. 6:09-cv-2050-orl-19DAB |
| Plaintiff, | : <br> : | <u>Civil Action</u> |
| v. | : <br> : | **FIRST AMENDED COMPLAINT** |
| THE LADIES PROFESSIONAL GOLF ASSOCIATION, and IMG WORLD, INC. | : <br> : <br> : | |
| Defendants. | : <br> : | |

## <u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

Plaintiff, Seoul Broadcasting System International, Inc. ("SBS"), by its attorneys Infante,

Zumpano, Hudson & Miloch, LLC and Cole, Schotz, Meisel, Forman & Leonard, P.A., as and

for its First Amended Complaint (the "Complaint") against defendants, The Ladies Professional

Golf Association (the "LPGA") and IMG Worldwide, Inc. ("IMG") (collectively, the

"Defendants"), respectfully alleges as follows:

### <u>Jurisdictional Venue</u>

1.      This action was transferred to the United States District Court – Middle District of

Florida pursuant to that certain Stipulation and Consider Order entered by the United States

District Court – District of New Jersey on December 4, 2009.

2.      This Court has original jurisdiction over this action based on complete diversity of

citizenship of the parties pursuant to 28 U.S.C. § 1332 in that it is brought between citizens of

different states and involves an amount in controversy in excess of $75,000 exclusive of interest

and costs.

3.      Venue is proper in the United States District Court – Middle District of Florida pursuant to 28 U.S.C. §1391 because defendant, LPGA, maintains its principal place of business within this district and has agents, employees and representatives in this district.

**Introduction**

4.      This action arises from, among other events, the unlawful termination of SBS's fifteen (15) year exclusive license agreement to televise LPGA golf tournaments on the SBS Golf Channel in South Korea.  In anticipation of the December 2009 expiration of its existing license agreement, negotiations occurred by and between SBS and the LPGA's agent, IMG, concerning the amount of annual license fees to be paid by SBS upon renewal of the license agreement.  Irrespective of whether a compromise fee amount was reached by the parties in this negotiation, at a minimum, SBS was promised a right of last option to acquire the broadcast license rights based on the LPGA's final must have number.  In reliance on these representations and assurances, SBS reasonably believed that if a compromise fee amount could not be agreed upon, the right of last option would nonetheless ensure that SBS would be guaranteed renewal of its broadcast rights upon acceptance of the LPGA's final must have number.

5.      As negotiations progressed, SBS waited patiently for the LPGA to present its final must have number for consideration.  Instead of honoring its promises and negotiating in good faith, the LPGA inappropriately (and without notice to SBS) terminated the negotiations and awarded the future broadcast rights to J-Golf, a Korean cable television network, abruptly severing its fifteen (15) year partnership with SBS.

6.      Beyond the unlawful termination of SBS's future broadcast rights, the LPGA also intentionally manipulated SBS's existing broadcast rights for the 2009 calendar year, resulting in a material breach of the parties' existing license agreement and a substantial reduction in the number and quality of LPGA events SBS was entitled to broadcast for the 2009 season.

## Identification Of The Parties

7.      SBS is and at all relevant times hereinafter mentioned was, a corporation existing under the laws of the State of New York, having an address at 3530 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010.  SBS owns and operates one of the three major national South Korean television networks, producing diverse programs in the areas of drama, entertainment, sports, culture and news for Korean audiences.  SBS is most recognized in and out of the Korean peninsula as the exclusive broadcast agent for LPGA events.

8.      Upon information and belief, the LPGA is, and at all relevant times hereinafter mentioned was, a non-profit organization existing under the laws of the State of Florida, having its principal place of business located at 100 International Golf Drive, Daytona Beach, Florida 32124.  The LPGA is a women's golf association that operates a series of golf tournaments and programs throughout the world.  The LPGA is most recognized for its annual LPGA tour, which consists of a series of weekly golf tournaments for elite female golfers from around the world.

9.      Upon information and belief, IMG is and at all relevant times hereinafter mentioned was, a corporation organized and existing under the laws of the State of Ohio, having an address at 1360 East 9th St., Cleveland Ohio, 44114.  IMG is an international sports, entertainment and media company focusing on event management and talent representation with a significant presence in golf, tennis and other sports industries.  At certain times referenced herein, IMG served as the exclusive media agent for the LPGA with respect to the negotiation of SBS's right of last option.

## Background

10.      Over the past fifteen (15) years, SBS and/or its parent corporation (collectively, "SBS") which is a leader in Korean network television, has been instrumental in popularizing the sport of golf in South Korea and responsible for creating a surge of interest in the game across all

demographics.  Through the programs televised on the SBS Golf Channel, SBS has introduced

the sport to millions of viewers throughout South Korea, making the "SBS" trade name

synonymous with the Korean golf industry.  In large measure through the efforts and dedication

of SBS, six (6) of the top twenty (20) players in the Rolex Women's World Golf Ranking are

from Korea.

11.     Korea's growing presence on the international golf scene has become a source of

great pride for SBS and a great reflection of the growing standard of golf in Korea.  SBS's role in

the widespread popularity of the sport is especially noteworthy considering that SBS brought the

sport to Korean television audiences at a time when golf was not widely appreciated in the

Korean culture.  Despite the historical lack of cultural interest, in 1995, SBS partnered with the

LPGA to acquire the exclusive broadcast rights to televise official LPGA events in Korea.

12.     Over the years, the parties' relationship expanded well beyond television

broadcast rights.  For instance, and without limitation, in 2004, SBS agreed to sponsor and

promote the "SBS Open at Turtle Bay", an annual LPGA tournament, which is venued in

Hawaii.  As event sponsor, SBS has pledged over $10 million to this LPGA event since 2004.

From SBS's perspective, this substantial pledge of financial support represented an investment in

the overall future of the SBS/LPGA partnership.  Through this and other ventures, SBS and

LPGA developed a relationship of trust, confidence and utmost good faith, which evolved into a

long-standing partnership dedicated to promoting the sport of golf.

**The January 2005 License Agreement**

13.     Consistent with the parties' past dealings and prior practice, in January 2005, the

LPGA and SBS's Korean parent company, SBS Broadcast System, Ltd. memorialized another

five (5) year renewal of the broadcast rights to LPGA events pursuant to a license agreement,

4

dated January 1, 2005 (the "Agreement").  A true and accurate copy of the Agreement is annexed

hereto as **Exhibit A**.

14.    Pursuant to the Agreement, which was subsequently assigned by SBS Broadcast

System, Ltd. to SBS, SBS acquired an exclusive license to Korean broadcast coverage of certain

LPGA tournaments, the majority of which were contemplated to occur in the United States, for a

term of five (5) years commencing January 1, 2005 and concluding December 31, 2009.  In

consideration of this grant of broadcast license, SBS agreed to pay to LPGA an annual license

fee of $2,250,000.00, payable in bi-annual installments of $1,125,000.00.  (See Agreement,

Basic Provisions, Section B).

15.    As set forth in the Agreement, SBS's exclusive broadcast license applies to

coverage of select LPGA events (the "Events"), which the parties agreed would be identified by

the LPGA in annual schedules and presented to SBS for final approval.  The parties further

agreed that the number of Events that SBS was entitled to broadcast annually must be

substantially similar during each year of the term of the Agreement.  The Agreement provides, in

pertinent part, as follows:

> The "Programs" shall consist of coverage of Official Ladies
> Professional Golf Association "LPGA" tour Events (the "Events",
> as hereinafter defined) during the Licensed Period.  "Event" shall
> mean select Official LPGA Tour events (subject to change pending
> scheduling and sponsorship from year to year), to be detailed in an
> annual schedule to be delivered by Licensor to Licensee by
> February 1 of that scheduled year, in the format as provided in the
> attached 2005 Schedule (Appendix A) to be approved by Licensee,
> with such approval not to be unreasonably withheld.  The number
> of Events shall be substantially similar during each year of the
> Term...

(See Agreement, Basic Provisions, Section A).

16.     On average, SBS has received broadcast coverage to approximately thirty (30) Events annually over the past several years, the majority of which have been venued in the United States.

17.     The Agreement further provides that the LPGA shall use commercially reasonable efforts to include or continue to include as part of SBS's television broadcast rights those LPGA events in which the LPGA possesses joint broadcast rights as well as events with respect to which the LPGA's contract with the event organizer is in the process of being renewed.  To the extent the LPGA cannot, after exercising commercially reasonable efforts, include such events within SBS's television broadcast rights, at a minimum, the Agreement requires the LPGA to grant SBS a right of first negotiation to acquire said broadcast rights.  (See Agreement, Basic Provisions, Section A).

18.     Pursuant to the Agreement, the grant of broadcast license conferred upon SBS is exclusive in nature, subject only to the LPGA's ability to exploit certain ancillary rights within the licensed territory.  The Agreement specifically provides, in pertinent part, as follows:

> The Licensor hereby grants to Licensee the Designated Rights to coverage of the Events as set forth herein and to the Programs for live and/or delayed transmissions as applicable, and as Licensee desires, during the Licensed Period throughout the Licensed Territory…
>
> The aforementioned Designated Rights are granted to Licensee in the Licensed Territory on an exclusive basis from the commencement of that Event through the termination of the Licensed Period.  Licensor may exploit Ancillary Rights within the Licensed Territory during the Licensed Period, provided that such exploitation shall be subject to the provisions of Section B(a).

(See Agreement, Basic Provisions, Section C).

19.     Due to the sensitive nature of the financial terms and conditions of the parties' business relationship, the Agreement prohibits either party from disclosing the financial terms of

the Agreement to third-parties.  The Agreement specifically provides, in pertinent part, as follows:

> <u>Confidentiality</u>
>
> Neither party nor any of its employees shall divulge to any third-party … any of the financial terms of this Agreement without the express permission of the other save as may be necessary in order to comply with any legal or regulatory requirements.

(<u>See</u> Agreement, Standard Terms and Conditions, Paragraph 16).

## Negotiations For the Renewal of SBS's Broadcast Rights

20. In contemplation of renewing SBS's broadcast rights upon conclusion of the present license term, in 2007, negotiations occurred between SBS and IMG, in its capacity as the authorized media agent for the LPGA, concerning renewal options for 2010 and beyond. Notwithstanding the fact the existing Agreement was not scheduled to terminate until December 2009, IMG nonetheless proposed that the parties enter into a new license agreement commencing January 2008 through December 2012, based on an increased annual license fee of $4.5 million.

21. Although SBS declined to renegotiate the license fee for the unexpired term of the existing Agreement, SBS agreed to entertain negotiations concerning the amount of the annual license fee payable by SBS upon renewal of the Agreement.

22. Based on an evaluation of then current market conditions, SBS conveyed to IMG that the LPGA's proposed $4.5 million base license fee was excessive.  SBS extended a counter-offer to IMG based upon a base license fee of $3 million annually, representing a thirty-three (33%) percent increase over the then prevailing annual license fee of $2,250,000.00. Discussions on this issue continued throughout 2008, without the parties making any significant progress toward reaching a compromise, but always recognizing SBS's right of last option.

23.     By late 2008, with the conclusion of the Agreement approaching, the parties increased their efforts to reach an understanding as to the financial terms of a renewal agreement. Toward this end, in early December 2008, SBS's president, Mr. Sang Y. Chun, travelled to the LPGA's headquarters in Daytona Beach, Florida, to meet and confer with LPGA Commissioner Carolyn F. Bivens.  At that meeting, Commissioner Bivens expressed disappointment as to what she perceived to be a below-market offer by SBS and admonished Mr. Chun to encourage SBS's Board of Directors to consider increasing its offer.

24.     Consistent with the parties' past practice and course of dealing regarding the renewal of SBS's broadcast rights, Mr. Chun suggested to Commissioner Bivens that the LPGA consider presenting SBS with a final must-have number to serve as SBS's final basis for consideration.

25.     Following the December 2008 meeting in Daytona Beach, SBS received confirmation from IMG representative, Ms. Brenda Lee, with whom SBS had continued to communicate concerning the renewal issue, that as in the past, SBS would receive an opportunity to consider the LPGA's final must have number as to the amount of the license fee.  SBS agreed to and accepted this opportunity.  As a result, regardless of whether the LPGA agreed to reduce its demand, this right of last option ensured that SBS would be guaranteed the renewal of its broadcast rights upon acceptance of LPGA's must have number.

26.     In early January 2009, Commissioner Bivens wrote to Mr. Chun in an apparent effort to measure SBS's willingness to increase its $3 million offer.  As reflected in Commissioner Biven's January 9, 2009 correspondence, a true copy of which is attached as **Exhibit B**, Commissioner Bivens renewed her request for SBS to reevaluate its position and

consider presenting a "different offer" to the LPGA.  That correspondence provides, in pertinent

part, as follows:

> In the case of the current offer SBS has made for the South Korean
> television rights of the LPGA for 2010 and beyond, there appears
> to be a large variation from the price value in the market place.  In
> view of the longstanding relationship we would respectfully
> request whether SBS might want to consider a different offer . . .
> Please let me know if there is an interest in re-evaluating the offer
> SBS has made for the LPGA.

27.     In response to Commissioner Biven's inquiry, by correspondence dated January

20, 2009, a true copy of which is attached as **Exhibit C**, Mr. Chun reiterated SBS's position and

explained to Commissioner Bivens that SBS's offer was supported by reliable market

information and based on commercially reasonable considerations.  Consistent with the

representations of IMG and the parties' course of dealing over the years, Mr. Chun again

requested that the LPGA present its final must-have number to SBS for its consideration.  That

correspondence provides, in pertinent part, as follows:

> . . . Let me again suggest that the LPGA come up with their
> "must-have" number – one that is discussed and agreed upon with
> your Board – and that will serve as our final basis of consideration.
> I think we can both agree that a firm resolution at this point will
> serve the interests of both parties.

28.     In mid-January, 2009, Mr. Chun contacted Commissioner Bivens in an attempt to

finalize negotiations and move forward with the renewal of the Agreement.  During the course of

that discussion, Commissioner Bivens expressed the LPGA's purported desire to reach common

ground on the license fee and expressed continued interest in finalizing an agreement.  Toward

this end, Commissioner Bivens agreed to meet Mr. Chun in Daytona Beach on Monday,

February 2, 2009, to bring closure to the on-going negotiations.

29.     At no time during the course of that discussion did Commissioner Bivens suggest,

either directly or indirectly, that the LPGA contemplated severing the parties' fifteen (15) year

partnership and awarding the post-2009 Korean LPGA television broadcast rights to a third-party.  To the contrary, based on the LPGA's representations and the parties' past negotiation practices, Mr. Chun reasonably believed that Commissioner Bivens would reveal the LPGA's final number at their February 2, 2009 meeting.  Under the worst case scenario, SBS was fully prepared to accept the LPGA's $4.5 million offer to ensure continued broadcast rights to LPGA events.  SBS never suspected (nor did it have any reason to suspect) that the future of its Korean broadcast rights were in jeopardy.

### The LPGA's Unlawful Termination of SBS's Broadcast Rights

30.     On January 30, 2009, only three (3) days before Mr. Chun and Commissioner Bivens were scheduled to meet again in Daytona Beach, Mr. Chun was informed that his meeting with Commissioner Bivens was no longer necessary because the LPGA had reached a tentative agreement with J-Golf, a Korean cable television network and competitor of SBS, for future Korean LPGA television broadcast rights.  Although this development shocked and deeply concerned SBS, by virtue of the fact the LPGA's Board of Directors had not formally approved the agreement with J-Golf, SBS remained cautiously optimistic that it would still receive an opportunity to accept the LPGA's final must have number before the J-Golf agreement received Board approval.

31.     Out of an abundance of caution and to ensure the renewal of SBS's broadcast rights, SBS instructed its attorney, Ronald C. Minkoff, Esq., to offer the LPGA an annual license fee of five percent (5%) above the highest offer the LPGA had received from any other potential licensee.  This offer was extended by Mr. Minkoff to Commissioner Bivens by correspondence dated February 5, 2009, a copy of which is attached as **Exhibit D**.  That correspondence provides, in pertinent part, as follows:

[O]ur client has authorized us to advise you that SBS is willing to pay an annual license fee upon a renewal of the current agreement that is five percent (5%) higher than the highest offer that the LPGA has received from any other potential licensee for the comparable Korean television rights.  We would expect this offer to be presented to the LPGA Board before any final decision is made to license the Korean broadcast rights to any other entity.

32.     In response to SBS's offer, by correspondence dated February 9, 2009, a copy of which is attached as **Exhibit E**, the LPGA's counsel, Mr. Joseph I. Rosenbaum, Esq., advised SBS that the manner in which it conveyed its offer was purportedly "inconsistent with an amicable and longstanding professional relationship" and was otherwise inappropriate.  This offer, however, was not rejected by the LPGA, leaving SBS mildly sanguine that the parties would ultimately reach agreement on renewal terms at the upcoming SBS Open event, which was scheduled for February 12, 2009, at the Turtle Bay Resort in Hawaii.

33.     Despite the representations of IMG and the assurances of Commissioner Bivens, immediately prior to the commencement of the SBS Open on February 12, 2009, the LPGA publicly announced to the media that it was severing its 15-year partnership with SBS effective January 1, 2010, and had awarded exclusive broadcast rights to future LPGA events to J-Golf.  Upon information and belief, IMG induced LPGA to breach its promise to SBS to enable IMG to pursue negotiations with J-Golf concerning the licensing of future LPGA broadcast rights.  IMG's actions were motivated solely by its own economic interest and without regard for SBS's right of last option.

34.     News of this development outraged SBS especially considering the LPGA never presented SBS with a must have number and elected to publicly announce the termination of SBS's broadcast rights at SBS's own sponsored tournament.  Stunned by this turn of events, SBS released statements expressing its disappointment in the LPGA's conduct and advising, in no

uncertain terms, that it would no longer sponsor the SBS Open or otherwise financially support any future LPGA ventures

### The LPGA's Retaliatory Manipulation of the 2009 Schedule

35.     In an obvious act of retaliation against SBS for publically criticizing its sharp business practices, the LPGA intentionally manipulated and revised the 2009 Schedule, resulting in a marked difference in the overall quality of the Events as well as a material reduction in the number of Events SBS was entitled to broadcast.

36.     In early 2009 the LPGA first revised the 2009 Schedule to eliminate several Events originally included as part of SBS's 2009 broadcast coverage as well as several Events which SBS has broadcasted in prior years.  In addition, certain Events were improperly included on the 2009 schedule that were not part of the Official LPGA Tour Events and/or which SBS is entitled to broadcast by virtue of its sponsorship rights.

37.     By reason of these and other deficiencies related to the first revised 2009 Schedule, by correspondence dated March 26, 2009, a copy of which is attached as **Exhibit F**, the LPGA's counsel was advised that SBS was not in a position to approve the 2009 Schedule in its present form and rejected same.

38.     Following SBS's rejection of the first revised 2009 Schedule, several other revised schedules were issued – one on April 20, 2009 by the LPGA's counsel, Mr. Joseph I. Rosenbaum, Esq. and another on April 23, 2009 by IMG.  Both of these schedules, however, failed to comply, in form and substance, with the terms of the Agreement.

39.     The most recent version of the 2009 Schedule, a copy of which is attached hereto as **Exhibit G,** was presented to SBS on July 15, 2009.  Similar to the four (4) prior versions of the 2009 Schedule, this latest version also fails to comply with the requirements imposed under

the Agreement and purports to entitle SBS to broadcast substantially fewer Events than contemplated pursuant to the Agreement.

40.     At no time has SBS received any meaningful explanation from the LPGA (or IMG) as to the reason, if any, for the numerous modifications to the 2009 Schedule including, without limitation, the omission by the LPGA of numerous Events which SBS typically broadcasted in prior years.  Furthermore, as to those Events omitted from the 2009 Schedule in which: (i) the LPGA possessed joint broadcast rights; or (ii) the LPGA's contract with the event organizer was in the process of being renewed, upon information and belief, the LPGA failed to exercise commercially reasonable efforts to include said Events in the 2009 Schedule.  In addition, the LPGA also failed to grant SBS a right of first negotiation to acquire television broadcast rights to said events.

41.     Despite repeated requests, the LPGA has also neglected to advise SBS as to which of the five (5) versions of the 2009 Schedule the LPGA intends to implement.  Considering that all of the purported Schedules are deficient, however, SBS has rejected and disapproved all versions of the 2009 Schedule issued to date.

42.     Notwithstanding the LPGA's breaches of the Agreement and other unlawful conduct, on or about April 9, 2009, SBS paid LPGA one-half of the 2009 license fee, consisting of $1,125,000.00.  The license fee was paid without prejudice to SBS's rights and without an acknowledgement that such funds are justly due and owing to the LPGA.  To the contrary, based on Defendants' disregard for SBS's existing rights under the Agreement and Defendants' otherwise immoral, deceptive and misleading negotiating tactics, SBS has been exposed to substantial damages.  All conditions precedent to bringing this action have been fulfilled or waived.

## FIRST COUNT (AGAINST LPGA)
### (Breach of SBS's Right of Last Option for Post-2009 LPGA Television Broadcast Rights)

43.      SBS repeats and realleges the allegations contained in the prior paragraphs of its

complaint as if same were set forth at length herein.

44.      LPGA, as aforesaid, afforded SBS a right of last option to consider LPGA's final

must have number with respect to broadcast rights to future LPGA events.  SBS accepted

LPGA's offer.

45.      Based on the promises and assurances of the LPGA and IMG, as aforesaid, all of

which were relied upon by SBS to its detriment, the LPGA conferred upon SBS a binding and

enforceable right of last option to consider the LPGA's final must have number with respect to

renewal of the Agreement.

46.      Notwithstanding the LPGA's promises and assurances, the LPGA never presented

SBS with its final must have number and instead abruptly terminated negotiations and awarded

broadcast rights to J-Golf without regard for its commitment to and partnership with SBS.

47.      The LPGA's failure to honor its promises and those of its authorized agent, IMG,

constitute a material breach of SBS's right of last option, subjecting SBS to substantial damages.

**WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands

judgment against Defendant, The Ladies Professional Golf Association, as follows:

    a.      Compensatory and consequential damages;

    b.      Interest;

    c.      Attorneys' fees and costs of suit; and

    d.      Such other and further relief as the Court deems just and equitable under

the circumstances.

<u>SECOND COUNT (AGAINST LPGA)</u>
**(Promissory Estoppel – Alternative Relief)**

48.     SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if same were set forth at length herein.

49.     As set forth above, LPGA and IMG clearly and unequivocally represented and promised to SBS that it would receive an opportunity to consider the LPGA's final must have number as to the amount of the license fee, thereby conferring upon SBS a "guaranty" to secure future broadcast rights notwithstanding any inability of the parties to agree upon a compromise fee amount.

50.     At all times LPGA and IMG knew and/or should have known that said representations and promises would reasonably induce SBS to wait for the LPGA to present its final must have number before accepting any existing offers.

51.     In reasonable and justifiable reliance on Defendants' promises and assurances, as aforesaid, SBS refrained from accepting the LPGA's existing offer and waited for the LPGA to present its final must have number.

52.     But for the promises and assurances of Defendants, SBS would have accepted LPGA's existing offer without waiting for LPGA's final must have number.

53.     By reason of LPGA's failure to honor its promises and assurances, as aforesaid, SBS has been subjected to substantial harm and relief is necessary to avoid injustice and achieve equity.

        **WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendant, The Ladies Professional Golf Association, as follows:

        a.     Compensatory damages;

        b.     Attorneys' fees and costs of suit; and

c.      Interest.

d.      Such other and further relief as the Court deems just and equitable under the circumstances.

### THIRD COUNT (AGAINST LPGA)
### (Declaratory Judgment)

54.     SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if same were set forth at length herein.

55.     Through its representation and promises, the LPGA conferred upon SBS a binding and enforceable right of last option to consider its final must have number with respect to the renewal of the Agreement.

56.     Notwithstanding SBS's right of last option, the LPGA never presented SBS with its final must have number, abruptly terminated negotiations with SBS and awarded future LPGA television broadcast rights to J-Golf.

57.     A justiciable controversy exists between the parties and SBS seeks a determination as to the parties' respective rights and obligations.

**WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendant, The Ladies Professional Golf Association, as follows:

a.      Adjudging and declaring that the LPGA conferred upon SBS a binding and enforceable right of last option to consider the LPGA's final "must have number" with respect to renewal of the Agreement;

b.      Adjudging and declaring that the LPGA breached the obligations arising out of SBS's right of last option; and

c.      Such other and further relief as the Court deems just and proper under the circumstances.

16

## FOURTH COUNT (AGAINST LPGA)
### (Breach of Fiduciary Duty)

58.     SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if same were set forth at length herein.

59.     By virtue of the parties' 15 year joint venture, the LPGA owed certain fiduciary duties to SBS including, without limitation, the duties of trust, loyalty, and utmost good faith.

60.     Notwithstanding the LPGA's duties and obligations to SBS arising out of the parties' joint venture, the LPGA breached those duties by, among other things: (i) failing to honor SBS's right of last option and otherwise negotiating in bad faith with respect to the renewal of SBS's broadcast rights; and (ii) intentionally failing to comply with the obligations imposed under the Agreement with respect to the 2009 Schedule.

61.     The LPGA's conduct, as aforesaid, was willful, wanton and in reckless disregard of SBS's rights and was otherwise wrongful.

62.     As a direct and proximate result of the LPGA's breach of its fiduciary duty, SBS has and will continue to suffer substantial damages.

**WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendant, The Ladies Professional Golf Association, as follows:

a.     Compensatory and consequential damages;

b.     Interest;

c.     Attorneys' fees and costs of suit; and

d.     Such other and further relief as the Court deems just and equitable under the circumstances.

17

**FIFTH COUNT (AGAINST LPGA AND IMG)**
**(Intentional Misrepresentation - Alternative Relief)**

63.     SBS repeats and realleges the allegations contained in the prior paragraphs of its

complaint as if set forth at length herein.

64.     Though its agent, IMG, LPGA represented, promised, and assured SBS that it

would be afforded an opportunity to consider the LPGA's final must have number on the issue of

future license fees.  Said representations were made within the course and scope of IMG's

agency.

65.     SBS relied on said representations, promises and assurances, all of which were

false and misleading, to its substantial detriment.  At the time LPGA and IMG made said

representations, promises and assurances, LPGA and IMG knew that said statements were false

and, furthermore LPGA and IMG never had any intention of honoring said representations and

promises.

66.     Contrary to Defendants' representations, promises, and assurances, LPGA never

offered SBS an opportunity to consider its final must have number and awarded future broadcast

rights to LPGA events to J-Golf.

67.     Defendants' conduct, as aforesaid, was willful, wanton and in reckless disregard

of SBS's rights and was otherwise wrongful.

68.     By virtue of Defendants' deceitful conduct and affirmative misrepresentations,

SBS has and will continue to suffer substantial damages.

**WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands

judgment against The Ladies Professional Golf Association and IMG Worldwide, Inc., jointly

and severally, as follows:

a.      Compensatory and consequential damages;

18

       b.      Punitive damages;

       c.      Interest;

       d.      Attorneys' fees and costs of suit; and

       e.      Such other and further relief as the Court deems just and proper under the circumstances.

### SIXTH COUNT (AGAINST LPGA AND IMG)
### (Negligent Misrepresentation – Alternative Relief)

69.     SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if same were set forth at length herein.

70.     At all times referenced herein, LPGA and IMG owed to SBS a duty to convey accurate and competent information with respect to the negotiation of broadcast rights.

71.     Through its agent IMG, LPGA represented, promised, and assured SBS that it would be afforded an opportunity to consider the LPGA's final must have number with respect to the amount of future license fees to be paid in connection with future broadcast rights.  Said representations were made within the course and scope of IMG's agency.

72.     LPGA, through its agent, IMG, failed to exercise reasonable care and competence in making said representations and promises to SBS and either knew said statements to be false or reasonably should have known that said statements were false at the time the statements were made.

73.     SBS, as aforesaid, reasonably relied on said representations, promises and assurances, all of which were untrue, to its substantial detriment.

74.     As a direct and proximate result of Defendants' negligent misrepresentations, SBS has and will continue to suffer substantial damages.

**WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendants, The Ladies Professional Golf Association and IMG Worldwide, Inc., jointly and severally, as follows:

      a.      Compensatory and consequential damages;

      b.      Punitive damages;

      c.      Interest;

      d.      Attorneys' fees and costs of suit; and

      e.      Such other and further relief as the Court deems just and proper under the circumstances.

### SEVENTH COUNT (AGAINST LPGA)
### (Breach of Obligation to Deliver the 2009 Schedule)

75.      SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if same were set forth at length herein.

76.      Pursuant to the Agreement, SBS is entitled to receive, on an exclusive basis, annual broadcast rights to Events in an amount substantially similar to and of comparable quality to the Events identified on the 2005 Schedule.

77.      Notwithstanding the terms and conditions of the Agreement, the LPGA failed and refused to deliver to SBS a Schedule of Events for the 2009 season in form and substance required under the Agreement.

78.      As a direct and proximate of the LPGA's material breach of Agreement, SBS has suffered substantial damages.

**WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendant, The Ladies Professional Golf Association, as follows:

      a.      Compensatory and consequential damages;

20

b.      Interest;

c.      Attorneys' fees and costs of suit; and

d.      Such other and further relief as the Court deems just and proper under the circumstances.

### EIGHTH COUNT (AGAINST LPGA)
### (Breach of Confidentiality Provision)

79.      SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if set forth at length herein.

80.      Pursuant to the confidentiality provision contained in the Agreement, the parties covenanted and agreed to refrain from disclosing to third-parties any financial terms of the parties' agreement.

81.      In a commercially unreasonable effort to obtain an unfair advantage in the negotiations concerning future LPGA broadcast rights, the LPGA knowingly disclosed to third-parties including, without limitation, J-Golf, the financial terms of the Agreement in direct violation of SBS's rights thereunder.

82.      Defendants' conduct, as aforesaid, was willful, wanton and in reckless disregard of SBS's rights and was otherwise wrongful.

83.      By virtue of Defendant's violation of the confidentiality provision, SBS has and will continue to suffer substantial damages.

**WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendants, The Ladies Professional Golf Association, as follows:

a.      Compensatory and consequential damages;

b.      Interest;

c.      Attorneys' fees and costs of suit; and

21

        d.      Such other and further relief as the Court deems just and proper under the circumstances.

## NINTH COUNT (AGAINST LPGA)
### (Breach of Exclusivity Provision)

84.     SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if same were set forth at length therein.

85.     Pursuant to the Agreement, as aforesaid, the grant of broadcast license conferred upon SBS is exclusive in nature within the licensed territory.

86.     In direct violation of SBS's exclusivity rights, the LPGA has unlawfully extended broadcast rights to third-parties with respect to certain Events that were inappropriately excluded from the 2009 Schedule.  In so doing, the LPGA has wrongfully deprived SBS of the benefits and rights arising from the Agreement's exclusivity provision.

87.     The LPGA's failure to honor its obligations pursuant to the Agreement's exclusivity provision constitutes a material breach of the Agreement, which has and will continue to expose SBS to substantial damages.

**WHEREFORE**, Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendant, The Ladies Professional Golf Association, as follows:

        a.      Compensatory and consequential damages;

        b.      Interest;

        c.      Attorneys' fees and costs of suit; and

        d.      Such other and further relief as the Court deems just and equitable under the circumstances.

## TENTH COUNT (AGAINST LPGA)
### (Unjust Enrichment – Alternative Relief)

88.     SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if same were set forth at length herein.

89.     Notwithstanding the LPGA's breaches of the Agreement and other unlawful conduct, as aforesaid, SBS paid LPGA, without prejudice to its rights, one-half of the 2009 license fee, consisting of $1,125,000.

90.     By reason of the LPGA's failure to comply with the terms of the Agreement and otherwise deliver the 2009 Schedule to SBS in the form required under the Agreement, the LPGA has been unjustly enriched by virtue of its retention of the license fee.

91.     As a direct and proximate result of the LPGA's unjust enrichment, SBS has suffered substantial harm.

**WHEREFORE,** Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendant, The Ladies Professional Golf Association, as follows:

a.     Restitution in the amount of $1,125,000 representing one-half of the 2009 license fee paid to the LPGA pursuant to the Agreement;

b.     Interest;

c.     Attorneys' fees and costs of suit; and

d.     Such other and further relief as the Court deems just and equitable under the circumstances.

## ELEVENTH COUNT (AGAINST IMG)
### (Tortious Interference with Contract/Prospective Economic Advantage)

92.     SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if as if same were set forth at length herein.

23

93.    SBS possessed a binding and enforceable right of last option pursuant to which LPGA agreed to present its final must have number to SBS for consideration.

94.    Notwithstanding IMG's knowledge of SBS's right of last option and the parties' on-going negotiations concerning future broadcast rights, IMG intentionally, and with malice, induced LPGA to breach SBS's right of first option and/or abandon all negotiations with SBS.

95.    In seeking to induce LPGA to breach SBS's right of last option, IMG acted solely in its own capacity, and not as an agent of LPGA, and acted exclusively for its own financial benefit.

96.    IMG's conduct, as aforesaid, was willful, wanton and in reckless disregard of SBS's rights and was otherwise wrongful.

97.    By virtue of IMG's conduct, as aforesaid, SBS has and will continue to suffer substantial damages.

**WHEREFORE,** Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendant, The Ladies Professional Golf Association, as follows:

        a.    Compensatory and consequential damages;

        b.    Interest;

        c.    Attorneys' fees and costs of suit; and

        d.    Such other and further relief as the Court deems just and equitable under the circumstances.

### TWELFTH COUNT (AGAINST IMG)
### (Tortious Interference With Exclusivity Provision)

98.    SBS repeats and realleges the allegations contained in the prior paragraphs of its complaint as if as if same were set forth at length herein.

99.     At all times, IMG was aware of SBS's exclusivity rights under the Agreement pursuant to which LPGA granted SBS the exclusive right to broadcast LPGA events within the licensed territory.

100.     IMG, acting for its own benefit and not as an agent of LPGA, intentionally and maliciously induced LPGA to violate SBS's exclusivity rights under the Agreement thereby causing LPGA to unlawfully extend broadcast rights to third-parties with respect to certain LPGA Events.

101.     IMG's conduct, as aforesaid, was willful, wanton and in reckless disregard of SBS's rights and was otherwise wrongful.

102.     By virtue of IMG's tortious interference with SBS's exclusivity rights, SBS has and will continue to suffer substantial damages.

**WHEREFORE,** Plaintiff, Seoul Broadcasting System International, Inc., demands judgment against Defendants, IMG Worldwide, Inc., as follows:

a.     Compensatory and consequential damages;

b.     Interest;

c.     Attorneys' fees and costs of suit; and

d.     Such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

103.     Plaintiff hereby demands a trial by jury on all counts so triable.

INFANTE, ZUMPANO, HUDSON &
MILOCH, LLC
Attorneys for Plaintiff, Seoul Broadcasting
System International, Inc.


By:   /s/ Robert W. Hudson
         Robert W. Hudson
         Fla. Bar. No. 993875

DATED:  December 23, 2009


COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.
Attorneys for Plaintiff, Seoul Broadcasting
System International, Inc.


By:   /s/ Joseph Barbiere
         Joseph Barbiere

DATED:  December 23, 2009

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2009 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     <u>/s/ Robert W. Hudson</u>
         Florida Bar No.:  993875

## SERVICE LIST

Steven R. Klein
Joseph Barbiere
Adam Goldstein
Cole, Schotz, Meisel, Forman & Leonard, PA
25 Main St
PO Box 800
Hackensack, NJ 07601-0800

Kim Marie Conner
Thomas F. Quinn
Wilson, Elser, et al.
33 Washington Street
Newark, NJ 07102

Robert Novack
Edwards, Angell, Palmer & Dodge, LLP
One Giralda Farms
Madison, NJ 07940

Cory Mauro, Esq.
Edward Angell Palmer & Dodge, LLP
One North Clematis Street, Suite 400
West Palm Beach, Florida  33401

Joseph A. Castrodale, Esq.
Richik Sarkar, Esq.
Ulmer & Berne, LLP.
1660 West Second Street, Suite 1100
Cleveland, Ohio 44113

James M. Kloss, Esq.
Wilson, Elser, et al.
P.O. Box 531086
Orlando, FL 32853